Kiedaisch et ux. *v.* Elkins Park National Bank
(et al., Appellants).

Argued November 24, 1936.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Herman Blumenthal*, for appellants.

*Frank A. Simons*, of *Bender, Rubin & Simons*, for appellees.

OPINION BY MR. JUSTICE MAXEY, January 11, 1937:

This appeal is from a decree of specific performance entered in the court below ordering appellants to assign

to appellees a first mortgage on certain premises located in Philadelphia. With minor exceptions hereafter referred to, the facts are undisputed. As found by the chancellor, they appear as follows:

On August 15, 1929, appellees, plaintiffs in this suit, purchased the premises in question, 301 West Godfrey Avenue, Philadelphia, from Britsch, giving him a purchase-money first mortgage for $5,000 as part consideration, with interest at the rate of six (6%) per cent per annum. They also gave their bond and warrant of attorney for the debt. On April 1, 1932, they conveyed the premises to Haag and his wife, subject to the $5,000 mortgage. Later they took from the Haags a second mortgage and bond accompanying it for $3,400, at the rate of six (6%) per cent. Appellees still hold this mortgage, which has now been reduced to $2,200. The Haags sold the property to Stark and his wife, two of the appellants, on July 23, 1934, under and subject to the two mortgages. At this settlement the Starks, who still own the property, were represented by Darrah, one of appellants, as their agent. On September 13, 1935, Britsch, the first mortgagee, assigned his bond and mortgage to Darrah, and on the same day Darrah assigned it to one of the defendants, Elkins Park National Bank, as collateral security for a loan of $4,000 then made to him. Likewise, on the same day, judgment in the sum of $10,000 was entered on appellees' bond, in favor of the bank as use-plaintiff. At the time when this was done the only default on the first mortgage was that the principal was overdue. Taxes and interest were regularly being paid, and no demand for payment of principal had been made.

When judgment on appellees' bond was entered up, it, of course, became a lien on other properties owned by them, to their embarrassment. After some discussion of this matter, Darrah informed them that the lien would be released if they would assign their second mortgage to him without consideration. Further nego-

tiations were had during which appellees signified their intention of raising sufficient funds to purchase the $5,000 first mortgage. On October 8, 1935, Darrah spoke to appellees' bank about the matter, expressing a willingness to assign the first mortgage to appellees for the full amount due, on condition that appellees granted the owners, Stark and his wife, a ten-year extension thereon at the reduced rate of interest of two (2%) per cent per annum. These propositions were both refused by appellees. At the time of this discussion Darrah said nothing about such an extension having already been granted, although at the hearing he subsequently testified that it was already in existence. Appellees' counsel notified Darrah's counsel that they had sufficient funds in hand and desired an assignment of the first mortgage, and were thereupon informed that the extension mentioned above had been granted. However, no such extension agreement was ever entered of record and the only proof of it was Darrah's verbal statement in his testimony at the trial that the extension had been granted just prior to the last assignment, to the Elkins Park National Bank. When the assignment was taken by the bank as collateral for the loan, it was ignorant of the fact that the extension at a reduced rate of interest had been agreed to by Darrah, its assignor.

On October 14, 1935, appellees made a tender to the bank of the amount due on the mortgage, and upon its refusal to assign the mortgage, appellees filed their bill against Darrah, Stark and his wife, and the bank, to compel the assignment on payment of the amount due on the mortgage. It averred that Darrah and the Starks had entered into a conspiracy for the purpose of injuring and harassing appellees, and with intent to deprive them of their equity in the Godfrey Avenue property consisting of the second mortgage held by them. Answers were filed by defendants, denying the charge of conspiracy or any attempt to injure or harass the plaintiffs, and the case proceeded to a hearing. The chan-

cellor made findings of fact and conclusions of law, and decreed that Darrah and the bank assign the mortgage as prayed for in the bill. In the final decree, as amended, the court in addition ordered the judgment entered on appellees' bond to be marked to their use, decreed that Stark and his wife execute and deliver, at the time of settlement, a declaration of no set-off as to the full amount of the principal, $5,000, with interest thereon at six per cent per annum, and imposed costs of the proceedings on Darrah and the Starks.

At the hearing the evidence strongly impugned Darrah's good faith in conducting the negotiations prior to suit. It was shown that he had previously, in telephone conversations and otherwise, evinced a spirit of ill-will towards plaintiffs. The inference was that he had engineered the deal whereby the mortgage was assigned to the Elkins Park National Bank, with the view of embarrassing plaintiffs' position as junior lienholders and of securing a lien on the other properties which they owned. The evidence strongly supports the view that Darrah purchased the mortgage in order to put appellees within his power so as to compel them to submit to the inequitable propositions of settlement he suggested, in favor of the Starks' interests, all of which appellees refused to consider. Darrah's leniency towards the Starks, the owners and terre-tenants of the property, for whom in the past he had acted as agent, in agreeing, as he testified, to reduce the rate of interest on the mortgage from 6 to 2 per cent is explained by the further fact that he received $1,000 from Stark as compensation for making the reduction, of which the bank knew nothing at the time when it took the assignment. The evidence was strongly indicative of a plan devised by Darrah whereby his animosity towards appellees could find effective expression, and the Starks would receive a favor at slight cost to him. As the chancellor said in his opinion, speaking for the court in banc, appellees found themselves in a position where they had just cause

for alarm, in respect to their interest as junior mortgagees, so long as Darrah owned or controlled the first mortgage. Moreover, the judgment which had been entered on the bond would continue as an existing incumbrance on the other properties which they owned unless they could themselves pay the mortgage off and be subrogated to the mortgagee's rights against the property.

Under the circumstances here present, for equity to afford the mortgagors the needed relief it was not essential that immediate foreclosure should have been threatened, or that proceedings should actually have begun. As Chief Justice MITCHELL said, in *Wunderle v. Ellis,* 212 Pa. 618, 620, 62 A. 106: "The whole right of the defendant as holder of the mortgage is to have his money paid him, and his whole claim on the land is to hold it as security for such payment. When he is offered his money his refusal to take it is persuasive evidence that he is not enforcing his legal rights in good faith but is seeking to use them for some ulterior and inequitable purpose. Even if this were not so the general doctrine of subrogation is that where a party can attain all his legal rights in either of two different ways, a court of equity will compel him to take that which will do the least injury to another having a junior interest in the subject matter, and if necesary will subrogate the latter to the prior rights. It is conceded 'that a junior mortgagee, judgment creditor, or other encumbrancer who pays off a prior encumbrance in order to protect his own interest in the encumbered estate, will as a general rule be subrogated to all the rights of the senior encumbrancer and if necessary for his protection may compel an assignment of the security': 27 Am. & Eng. Ency. of Law (2d ed.), Subrogation IV, 3, page 243."

A similar case arose in *Hopkins Mfg. Co. v. Ketterer,* 237 Pa. 285, 85 A. 421, in which we said, at page 290: "The plaintiff company presented a case which entitled it to equitable relief. The mortgagee was entitled to his money when it became due by the terms of his contract.

If it were not paid he could proceed and collect it. The mortgage is security for the indebtedness and furnishes the legal means of enforcing payment. When, however, the debt is tendered to the mortgagee he must receive it, and he is prevented from taking any proceedings on the mortgage to collect. Generally speaking, he is not required on receipt of the indebtedness to assign or transfer the mortgage; he can only be required to satisfy it. The circumstances however may be such that when the debt is paid he may be required to assign the instrument for the protection of the party making the payment. If a junior mortgagee, judgment creditor or other encumbrancer pay a prior encumbrance in order to protect his own interest in the encumbered estate he will as a general rule be subrogated to all the rights of the senior encumbrancer, and if necessary for his protection may compel an assignment of the security."

The power of a court of equity to grant such relief was stated in *Dollar Savings Bank, for use, v. Duff,* 269 Pa. 29, 31, 112 A. 23, to be "undoubted." See also *Lyon's Appeal,* 61 Pa. 15. Authorities on the subject in this and other jurisdictions are collected in a note in 93 A. L. R. 89. In view of the fact that appellees were not only mortgagors of the property, whose interest was vitally affected by entry of judgment on their bond, but also holders of a second mortgage on the premises imperiled by the prejudicial acts of the holder of the first mortgage, they brought themselves within the beneficent operation of the principle applied in the cases cited above. The facts entitled them to the relief they obtained.

The contention is made, however, that appellees had a statutory remedy by proceeding under the Act of April 28, 1903, P. L. 327 (21 P.S. secs. 735-738), and that the relief afforded should not exceed the limits provided by that act. This statute entitles a mortgagor whose personal bond remains outstanding, after conveying the property to another and after maturity of the mortgage,

upon payment to the mortgagee of the amount due thereon with interest and costs, to demand an assignment of the bond and mortgage, and any judgment entered thereon, to himself or his nominee. Upon refusal by the mortgagee, the mortgagor may petition the court of common pleas, "setting forth the fact, and praying for an order, which the said court is hereby authorized to make, . . . after hearing, upon the mortgagee . . . to the mortgagor or his nominee, on the payment of the debt, interest and costs. . . ." Then follows a proviso empowering the court, in case the mortgagee neglects or refuses to comply with the order, to enter a decree releasing the mortgagor from personal liability on his bond and restricting to the mortgaged property alone the lien of any judgment that may have been entered on the bond.

This act is ample warrant for the entry of the decree of the court below ordering the assignment to be executed and delivered to appellees, and the judgment to be marked to their use, for the legislative grant is clear and specific that such an order may be entered. The award of an alternative remedy available to the mortgagor, if compliance with the original order should be refused, did not diminish the power of the court to enter and enforce its decree by any procedure appropriate in a court of equity. The statutory remedy provided by the Act of 1903 was, moreover, not exclusive as applied to plaintiffs in this suit, since, in addition to being mortgagors, and under that denomination coming within the express terms of the act, they are also junior lienholders on the same property. As such, under the general equitable principles stated and applied in the cases cited above, they are entitled to the additional and further relief, against the appellants, Stark and his wife, which was granted.

It is urged that these appellants, the Starks, will lose the benefit of the alleged extension agreement entered into between them and Darrah, the holder of the mort-

gage, since the decree of the court below orders them to execute and deliver a document admitting the continued existence of the first mortgage in the full principal amount with interest due at 6 per cent. To this it must be answered that appellees, so far as they come within the scope of the relief afforded by the Act of 1903, supra, are entitled to have from the present holder thereof an assignment of the bond and mortgage which they executed in accordance with "the terms and conditions thereof," as referred to in the act, and not subject to new limitations and conditions created by an agreement to which they were strangers. As the chancellor pointed out in his adjudication, the existence of an extension agreement has no effect on appellees' rights under the act. In *Willock's Est.*, 58 Pa. Superior Ct. 159, the present Chief Justice, speaking then as Judge of the Superior Court, discussed the bearing of the Act of 1903, supra, on the rights of mortgagors, and said the following, at page 167: "Attention is called to the fact that this act refers to the bond and mortgage given by the mortgagor, according to its terms and conditions, not to a bond and mortgage loaded down with new conditions imposed by others to which the mortgagor was not a party, but the bond and mortgage as they existed at the time he signed them. It is to these instruments that the equity of subrogation is directed, when he places himself in a position, either through his statutory remedy or under his equitable right, to demand their assignment. The mortgagee or owner of the instrument, is bound to comply with the demand, and if he fails by reason of his contract with the grantee, or any other legal reason, the mortgagor is released from liability. . . . The mortgagee must be ready to permit the mortgagor to pay his bond when it is due and to have returned to him unimpaired the collateral, this primary fund that he put up to insure payment, namely, the mortgage covering what was at one time his land. Should the mortgagee comply with the terms of the de-

mand, under the Act of 1903, and assign the mortgage and bond, the mortgagor can thereafter foreclose as though the extension were not in existence. If such proceeding should result in a loss to the person to whom the extension was given, his remedy would be against the giver of the extension for such damage. The mortgagor has received the full consideration, has executed his solemn promise in writing to pay the obligation unconditionally."

The holder of legal title to the property may protect himself in such circumstances by procuring the consent of the mortgagor to the extension or other modification of the terms of the mortgage, a consent which, in most cases, would gladly be given.

In the case before us, if this proceeding were entirely within the purview of the Act of 1903, recourse doubtless could not be had for relief against a terre-tenant or owner of the mortgaged property, since the act does not purport to give the mortgagor such a remedy. In view of the broadened scope of this proceeding, and the fact that the terre-tenant is a party to the suit, no objection to the nature of the relief granted can avail.

Appellants raise the point that circuity of action will be invited if the decree stands, since under the Act of May 4, 1927, P. L. 710 (21 P.S. secs. 733, 734), once appellees have received an assignment of the first mortgage, Stark and his wife, the real owners, will immediately be entitled to compel a reassignment of the mortgage to themselves or their nominee, who, it is suggested, may well be Darrah, the present holder. Such an event could not result, however, and the objection is without force. The Act of 1927 specifically provides that the owner of property encumbered by a mortgage may not compel an assignment, and no decree to that effect shall be entered, unless "all parties holding any interest in the lands so encumbered have joined in the application for the assignment. . . ." Hence unless appellees, holding a second mortgage, should assent, a

reassignment of the first mortgage alone could not be required: *Green et al. v. Second Allegheny Building Assn.,* 311 Pa. 305, 310, 166 A. 865; see also *Butler County National Bank v. St. Michael's Greek Catholic Church,* 272 Pa. 440, 116 A. 390. As an additional consideration, it may be suggested that under the Act of 1927 such assignment "creates no personal liability on the part of the assignor . . . and . . . shall be without recourse." Appellees, having received an assignment of their own bond, could not through any form of law be required to assign it, or the judgment entered on it, to another as an outstanding personal liability against them, which now it is.

The assignments of error are all overruled.

The decree of the court below is affirmed, at the costs of the appellants.